UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| United States of America, | ) | Case No. 21-CR-28 (ADM/KMM) |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S POSITION ON** |
| | ) | **SENTENCING** |
| v. | ) | |
| | ) | |
| Kendall Dvontae Pruitt, | ) | |
| | ) | |
| Defendant. | ) | |

Kendall Pruitt walked out the front doors of the Volunteers of America halfway house on May 2, 2020, less than 24 hours after receiving news that his big brother had been shot to death—and that he would be unable to get a family pass for the funeral due to COVID.  He was grief-stricken.  Devastated.  Numb to any thought other than being with his mother and remaining brother.  He went home to them.  He stayed home to attend the funeral.  And then he made the further mistake of not immediately turning himself back in.  To his credit, Mr. Pruitt used this time to make positive changes in his life.  He committed himself to sobriety.  He laid low and free of trouble.  And after he was returned to custody in August 2020, he participated actively in substance-abuse treatment and GED programming.

Mr. Pruitt has remained detained since his August arrest—that is, for seventeen months as of the time of sentencing, ten of which will have been in custody for this escape offense.  As explained below, he faces an advisory Guidelines range of eight to fourteen months.  He respectfully asks this Court to grant him a sentence of time served (ten

months), a sentence that will best allow him to continue his progress in treatment and be a support to his family.

## II.     Procedural background and the applicable Guidelines range.

The government filed an indictment against Mr. Pruitt charging him with one count of escape from federal custody in violation of 18 U.S.C. § 751(a).  Dkt No. 1.  Mr. Pruitt pleaded guilty to that count.  Dkt. No. 152.

The parties and probation agree that the base offense level under the federal Sentencing Guidelines is thirteen.  U.S.S.G.  2P1.1(a)(1).  The parties and probation further agree that Mr. Pruitt qualifies for a four-level reduction because he did not commit a federal, state, or local offense while away from the halfway house, resulting in an adjusted offense level of nine.  U.S.S.G. § 2P1.1(b)(3).  Mr. Pruitt receives an additional two levels off for accepting responsibility, making his total offense level seven.  U.S.S.G. 3E1.1(a).  Mr. Pruitt has eight criminal history points (including two points for serving a sentence at the time of this offense), placing him in criminal history category of IV.  U.S.S.G. § 4A1.1(d) & Chpt. 5, Part A.

The parties and probation agree that with a total offense level of seven and criminal history category IV, Mr. Pruitt's Guidelines range is eight to fourteen months.  *See* PSR ¶ 63; Dkt. No. 53 at 2.

## III.    Background and characteristics.

Kendall Pruitt was born and raised in Saint Paul.  His single mother did the best she could to raise him and his two older half-brothers, Darius and Jaequese.  Darius was five years older than Kendall; Jaequese is three years older; Kendall is the baby of the family.

Darius and Jaequese's father was murdered when the boys were young. Mr. Pruitt's father never lived with the family, and Mr. Pruitt saw him only during the sporadic stints when the father was out of custody. (Mr. Pruitt reports that his father is currently homeless and his whereabouts are unknown.) Their mother, Ellice, worked long hours, but money was tight, and Mr. Pruitt remembers going hungry and resorting to stealing to get food as a boy.

With no parent at home much of the time, Darius became the caretaker for his younger brothers. Jaequese writes that, "growing up[,] we did everything together." Exh. C. Kendall recalls that Darius would pick him up from school and take him to the Boys and Girls Club to play basketball in the afternoons. On the weekends, Darius would cook Kendall and Jaequese breakfast. When Darius was a teenager and worked in fast-food restaurants, he would always bring home meals for the family.

Darius and Jaequese grew up, graduated, and went on to have families and steady jobs. That was their mother's expectation for all three boys. But Mr. Pruitt struggled to meet that expectation. He suffered from ADHD and other learning disabilities, and he did poorly in school. His mother worked hard and often wasn't home to help him with his schoolwork or his mental-health needs.

At thirteen, Mr. Pruitt turned to marijuana to calm him down. Two years later, poverty and pressure from the streets led him to befriend a bad crowd. His marijuana and alcohol use increased dramatically. He got involved in gang life and received three juvenile adjudications by the time he was seventeen (for truancy, missing curfew, and weapon possession) and an adult conviction at age eighteen for a fight with a rival gang. Mr. Pruitt

recalls that Darius spent hours on the phone with him or visiting him in person in juvenile detention, encouraging him to leave gang life and get on the right path.

In 2017, Mr. Pruitt received his second conviction (and first federal offense), for being a felon in possession of a firearm. He was sentenced to four-and-a-half years. Due to his good-time credit, Mr. Pruitt was released to a halfway house on February 20, 2020, where he remained in the custody of the Bureau of Prisons.

At the halfway house, Mr. Pruitt began working with reentry staff and his family to make a successful transition to community life. Mr. Pruitt's mother explains that she and Mr. Pruitt "started working on plans for his future, including a possible move to another city to get a fresh start and to get away from the negative influences that landed him in prison before." Exh. B at 2. Mr. Pruitt also was eager to reconnect with his brothers, Darius and Jaequese. Despite their differences, the three boys had remained very close.

Unfortunately, within weeks of his placement at the halfway house, the onset of the COVID-19 pandemic derailed Mr. Pruitt's plans. It was an extraordinarily difficult time to be in any type of custodial setting. Mr. Pruitt was placed in an indefinite lockdown. He was unable to get passes or furloughs to seek employment , go to mental-health or substance-abuse treatment, or participate in other programming. He could not receive visitors. The fear of illness and death was scary and fresh. And the halfway house's desperate response was to lock everyone in their rooms. While that response was likely appropriate, it also made the transition to reentry for Mr. Pruitt exceedingly stressful.

Then, on the night of May 1, 2020, after six weeks of being locked in his room and living with this fear and stress, Mr. Pruitt received news that his brother, Darius, was shot in

the back at a Saint Paul gas station by a person he'd never met and who had accused him of 'cutting' in line. *See* Exh. E. Darius died that night.

Mr. Pruitt's mother, Ellice, recalls that Mr. Pruitt was "heartbroken and grief-stricken." Exh. B at 2. His brother Jaequese writes that Darius's "devastating loss . . . [took] a toll on Kendell, emotionally and mentally." Exh. C. Mr. Pruitt was desperate to be with his mother and with Jaequese. He made repeated requests for a family pass from the halfway house. But his requests were denied due to COVID. Mr. Pruitt went to sleep at the halfway house that night with the grief of loss and the separation from his family weighing heavily on him. He made it through the next morning still in custody. But by the afternoon of May 2, his grief overwhelmed him. He left the halfway house, and he went home. He helped his mother plan for and prepare Darius's May 15 funeral. *See* Exh. D. He grieved with his family.

Mr. Pruitt accepts that he made a mistake leaving the halfway house without permission. In the six weeks between the funeral and his arrest Mr. Pruitt did not return to gang life; instead he committed himself to sobriety and laid low with his family. Still, he accepts responsibility for his poor decision not to turn himself in immediately after the funeral. *See* Exh. A at 1–2. As Mr. Pruitt explained to the probation officer:

> I know what I did was not right and I accept responsibility for my actions. When my brother Darius died, I was desperate to go to his funeral. I asked the halfway house if I could go, and they said no because of COVID. Then I left the halfway house without permission. I know I should have gone about it the right way. And I know I should have turned myself in right away after the funeral. I was scared and I wasn't coping well, and I kept making the bad decision to put it off. My decision to do that has hurt my family, and I want to apologize to my mother, my siblings, Darius's family, and also to the Court.

PSR ¶ 13.

**D.    The circumstances of Mr. Pruitt's arrest and his post-offense programming.**

On August 8, 2020, Minneapolis police pulled over a car on suspicion that a person they wanted on a weapons charge was in the front passenger seat.  Mr. Pruitt was sitting in the back of that car, behind the wanted person.  A female was driving, and another male passenger sat in the back seat next to Mr. Pruitt.  Police searched the car and found two guns in it:  one was in the female driver's purse; the other was in the back seat, near Mr. Pruitt's feet.  Mr. Pruitt explained that the person in the front passenger seat had thrown the gun into the back seat when he saw the police approach.  Mr. Pruitt insisted that the gun was not his and that he had never touched it.  Indeed, he volunteered a DNA sample, and neither his DNA nor his fingerprints were found on either firearm.[1]

Upon his August 8, 2020 arrest, Mr. Pruitt was returned to Bureau of Prisons' custody and incarcerated at the Renville County Jail to complete the remainder of his federal sentence for the 2017 conviction.  While at the Renville County Jail, Mr. Pruitt participated

---

[1] In its objection to the pre-sentence report, the government took the position that Mr. Pruitt possessed the firearm after being convicted of a felony while on escape status, and thus should not receive a four-level reduction under U.S.S.G. § 2P1.1(b)(3).  *See* Dkt. No. 46. The government did not submit any evidence supporting its position.

The final pre-sentence report rejected the government's objection and determined that the four-level reduction should apply.  *See* PSR at A.1.  The probation officer provided three grounds for this conclusion:  (1) that no DNA or other evidence was found suggesting that Mr. Pruitt possessed the gun; (2) that Mr. Pruitt consistently denied possessing the gun; and (3) the front-seat passenger pleaded guilty to possessing the firearm recovered in the vehicle.  *Id.*

In its sentencing position paper, the government formally withdrew its objection and agreed with the probation officer that Mr. Pruitt did not commit another offense while on escape status and thus merits the four-level reduction.  *See* Dkt. No. 53 at 1.

There is, therefore, no evidence, let alone a preponderance of the evidence, to support a finding that Mr. Pruitt committed the offense of being a felon in possession of a firearm while on escape status.

6

in substance-abuse programming.  He also began taking courses to complete his GED.  Especially after his brother's death, Mr. Pruitt was—and is—committed to putting himself on the right path.

In February 2021, Mr. Pruitt was transferred from Renville County Jail to Sherburne County Jail.  He completed his prior sentence on March 16, 2021 and has been in pre-trial custody on this offense since that time.  All told, Mr. Pruitt will have been in custody for seventeen months as of his sentencing hearing, ten of which will have been for this offense.

## V.    A time-served would be sufficient but not greater than necessary.

This Court must impose a sentence that is sufficient but not greater than necessary to accomplish the many goals of federal sentencing.  18 U.S.C. § 3553(a).  In determining what sentence best meets the sentencing goals, this Court must consider the characteristics of the defendant, the circumstances surrounding the offense, and how an individual may differ from those who are similarly charged.  *See id.* at § 3553(a)(1)–(7).  Here, applying the sentencing factors to accomplish the sentencing goals, Mr. Pruitt asks this Court to impose a sentence of time served—a sentence that would also fall in the mid-range of the eight-to-fourteen-month Guidelines range.

### A.    The nature and circumstances of the offense and the history and characteristics of Mr. Pruitt.

As explained above, Mr. Pruitt's challenging background and the unique circumstances of this offense favor a time-served sentence.  Mr. Pruitt has lived most of his life with untreated learning disabilities and mental illness and, despite his mother's best efforts, inadequate parental support for these conditions.  Alcohol and marijuana became his

methods of coping; they led him to gang life at a tender age; and that, in turn, led him to where he is today.

His brother's death, while tragic, has also been a wake-up call for Mr. Pruitt. He has become sober and is committed to treatment and rehabilitation. He wants to finish his GED and live life the way his brother would have wanted him to do: applying himself through honest work and being a support for his family. A within-Guidelines, time-served sentence would take into account the unfortunate circumstances of this offense as well as the struggles Mr. Pruitt faced and the positive steps he has taken to address them.

**B.      The need for the sentence imposed and the kinds of sentences available.**

A time-served sentence will also be more than sufficient to ensure public safety and deter Mr. Pruitt from committing future offenses. Outside of this escape offense, Mr. Pruitt's most recent criminal conduct is more than five years old. His record before that all occurred while he was a young teenager.

At 24, Mr. Pruitt is in a stage of his life where he is ready for and open to substance-abuse treatment and mental-health support. In his own words, Mr. Pruitt feels that "I went into the BOP a boy and I came out a man." Exh. A at 1. He notes that he "didn't grow up in the street life" and recognizes that his "very bad decision" to get involved in that life as a teen "has [a]ffected me and my family tremendously." *Id.* He knows that he has "to take responsibility for . . . my actions that brought me before [Your Honor] today." *Id.* He is ready to "step up to the plate," "be a better person," and "start[] on a good track." *Id.* at 2. With treatment and support, Mr. Pruitt can succeed at these things.

The seventeen months that he has spent detained since his August 2020 arrest are more than adequate to protect the public and deter Mr. Pruitt from future criminal conduct. And any residual concerns regarding Mr. Pruitt can be adequately addressed by imposing a period of supervised release, during which probation can monitor him for any indications that he is struggling with remaining law-abiding. It is notable that the circumstances of this incident were so unique that it is unlikely that Mr. Pruitt will find himself facing such a situation again. These factors thus warrant a sentence of time served.

## VI.    Conclusion

Counsel respectfully submits that when this Court focuses in on Mr. Pruitt's actual conduct in this case and the seventeen months that Mr. Pruitt will have spent in custody since his August 2020 arrest, a time-served sentence is more than sufficient to accomplish the goals of sentencing. Mr. Pruitt asks that this Court impose a time-served sentence, which would fall within the advisory Guidelines range.

Dated:  December 21, 2021                    Respectfully submitted,

*s/ Sarah R. Weinman*

Sarah R. Weinman
Assistant Federal Defender
Attorney ID No. 401624
Office of the Federal Defender
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
Counsel for Mr. Pruitt